EAGLE DRUG CO. v. WHITE.    (No. 863.)

(Court of Civil Appeals of Texas. Amarillo. Dec. 11, 1915. Rehearing Denied Feb. 2, 1916.)

1. PARTNERSHIP &⇐48—EVIDENCE.

Declaration which B. made in a contract of sale of a business, drawn up and signed by him in the absence of W., that they were partners therein, is inadmissible against W.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 66, 68–73; Dec. Dig. &⇐48.]

2. PAYMENT &⇐47—APPLICATION.

Where, pending a sale by B. to defendants of a stock of goods, on which plaintiff had a lien as security for a note given by B., it was agreed by B. and plaintiff that the purchase price should be applied first to payment of certain debts, including said note, but not a later debt of B. to plaintiff, it was plaintiff's duty, receiving a payment from such purchase price, to so apply it, whether or not defendants in making the purchase assumed the payment of the note.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 127, 129; Dec. Dig. &⇐47.]

3. EVIDENCE &⇐271 — CONVERSATIONS WITH ANOTHER.

Statements and discussions between plaintiff and his attorney in the absence of defendants are inadmissible on the question of the agreement of the parties.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1068–1079, 1081–1104; Dec. Dig. &⇐271.]

4. CONTRACTS &⇐229 — CONSTRUCTION — PAYMENT OF DEBT.

Defendants merely agreeing that if plaintiff paid off a judgment against a stock of goods

which they were buying of B., he should be paid out of such money as might be due B. after other creditors were paid, were not liable for any more than was so due B.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1045–1057, 1059–1066, 1070, 1077; Dec. Dig. ☞229.]

5. FRAUD ☞11—PRESENTATIONS—OPINIONS.

A representation as to the amount that would be due another, appearing under the evidence to have been only an opinion, the parties understanding that it was doubtful how much would be due, will not support an action of deceit.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 12, 13; Dec. Dig. ☞11.]

6. CHATTEL MORTGAGES ☞243 — RELEASE — SIGNING BILL OF SALE.

A mortgage lien on a stock of goods is not released by the mortgagee joining in a bill of sale of the goods, it being agreed with the purchasers that it should not be delivered till the mortgagee was paid.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. § 508; Dec. Dig. ☞243.]

7. FRAUDULENT CONVEYANCES ☞182—BULK SALE—LIABILITY OF PURCHASER.

Rev. Civ. St. art. 3972, places no personal liability for the debts of the seller on the purchaser of a stock of goods in bulk.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 568–577; Dec. Dig. ☞182.]

8. FRAUDULENT CONVEYANCES ☞182—BULK SALE—RIGHT OF MORTGAGE.

Though the purchaser of a stock of goods in bulk does not assume a mortgage debt thereon, the mortgagee, not having waived his lien, may foreclose.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 568–577; Dec. Dig. ☞182.]

9. PARTNERSHIP ☞29—BUYING BUSINESS.

Persons, though agreeing to purchase a business and conduct it as partners, do not become partners, so that one can bind the others by contracts or representations, till the purchase is made and the business delivered them; the agreement between them being till then merely executory.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 30–33; Dec. Dig. ☞29.]

Appeal from District Court, Wilbarger County; J. A. Nabers, Judge.

Action by J. F. White against the Eagle Drug Company and others. From the judgment for plaintiff, certain defendants appeal. Reversed in part, and remanded.

Cook & Tant and Geo. W. Garland, all of Vernon, Seay & Seay, of Dallas, and Dedmon & Potter and W. C. Blalock, all of Ft. Worth, for appellants. Berry, Stokes & Morgan and Bonner & Storey, all of Vernon, for appellee.

HUFF, C. J. This suit was instituted in the district court of Wilbarger county by J. F. White, against S. D. Bettis, J. L. De Pauw, A. S. Ross, and A. B. Garland, alleging that the three last-named parties constituted the firm known as the Eagle Drug Company. White sued on a note for $1,000, executed by S. D. Bettis, dated the 2d day of July, 1912, due October 2, 1912, payable to the order of J. F. White, bearing interest at the rate of 10 per cent. from date per annum, and 10 per cent. attorney's fees; and also set up a mortgage on a soda fountain and other fixtures in the drug store, which is alleged was duly recorded. It is alleged: About March 20, 1913, De Pauw, Ross, and Garland purchased the drug store from Bettis, who used the trade-name of Eagle Drug Store while conducting the business, that the parties so purchasing had actual and constructive notice of the above debt and mortgage, and that as part of the consideration for said property De Pauw, Ross, and Garland assumed the above note, and that the above debt was one of the listed debts furnished the proposed purchasers by Bettis during the pendency of the trade and was taken in consideration as part of the purchase price, and that they agreed in writing to pay the same, and that they took charge of the store and proceeded to run the same in the name of the Eagle Drug Company. That about the 26th of March, 1913, an execution was levied on the drug store to collect a judgment of about $1,415.38, and that at said time the purchasers had in a manner taken charge of the store and were then so in charge, with the view of getting familiar with the business and ascertaining the indebtedness against it in order to finally close the sale. That Bettis was unable to pay the judgment and discharge the execution, and that all of the defendants requested White to pay it, which he did. In order to induce White to do so, "it was agreed and understood by and between the plaintiff and all of the defendants that all of the equity or overplus to the said S. D. Bettis, from such sale of such property, after the payment of the listed debts against the same, should be applied to the payment and reimbursement of the plaintiff of the said $1,415.38 until the same was fully satisfied, and all of the defendants, as a further inducement to plaintiff to pay said $1,415.38, represented to him that there would be a balance of at least $1,500 going to defendant S. D. Bettis, after paying all listed debts against said Eagle Drug Company, and that plaintiff should get his money back in a few days from that time, and that J. L. De Pauw, A. S. Ross, and A. B. Garland, as an inducement to plaintiff to get him to pay said $1,-415.38, represented to him and promised him that if he would pay said amount that they would see that he was repaid his said money within a few days from that time out of the price they were paying for said stock of goods," etc. That plaintiff was unacquainted with the facts and relied on the representations and promises so made and paid the money, as requested, and agreed upon, and that such payment was a material benefit to all the defendants. That there was, after paying all of the listed debts and ex-

penses provided for, an equity, approximately $1,500, which should have been paid to plaintiff or so much thereof as was necessary to pay the amount advanced, with 6 per cent. interest from the 26th day of March, 1913, which De Pauw, Ross, and Garland failed and refused to pay, except the sum of $503, paid about the 20th of May, 1913.

There is a prayer for judgment on the note, for interest and attorney's fees, together with a foreclosure of the mortgage lien, and also for the balance on the $1,415.38, the sum advanced after deducting the sum of $502 paid, leaving a balance of $863.38. Plaintiff asked for judgment against all of the defendants.

The defendants, appellants herein, J. L. De Pauw, A. S. Ross, and A. B. Garland, denied specifically the assumption of the debts or either of them, or that there was $1,500 equity belonging to Bettis and specifically denied the allegations in the petition, setting up liability, and that they or plaintiff knew how much equity Bettis had in the drug store at the time of the trade. They specifically alleged, on information and belief, that White was the owner of the drug store and fixtures, alleging that Bettis had conveyed the same to him by a bill of sale. They further alleged: That about the 5th of April, 1913, White and Bettis sold and delivered to these appellees the Eagle Drug Store, and under the contract of sale therefor they were to accept as correct the list of articles and prices thereof composing said stock, as set forth in a certain inventory of said stock, made after the 20th day of March, 1913, and prior to the contract by Bettis and others. That while making the inventory certain goods and articles were sold, and that the cash realized therefrom amounted to $1,005.-45, which was on hand and held in contemplation of the sale; that these appellants would accept said sum of money in lieu of the articles sold. They agreed that the fixtures which had been purchased from Houssels and Fain should be fixed at the price as shown by the inventory made by said parties and upon which same was sold to the Eagle Drug Company, and that the remainder of the fixtures were to be the original cost price to the Eagle Drug Company. That these appellants were to pay plaintiff and the said Bettis for said property as follows: They were to assume a certain debt to the Crowdus Drug Company, aggregating the sum of $2,-100.98, in satisfaction of which it was understood the Crowdus Drug Company had then agreed to accept notes executed by appellants, payable to said company, in the sum of $300 each (except the last due), and due respectively monthly after date thereof, and appellants agreed to assume and pay certain debts due the Waggoner National Bank of Vernon, Tex., aggregating the sum of $840, and agreed to pay the sum of $5,000 cash, or so much thereof as was necessary to amount to the full of said stock and fixtures, and agreed that the balance over and above said sum be paid in cash, or, if appellants elected, by delivering to Bettis and White their promissory notes, payable to White's order. It was further agreed that appellee and Bettis were to make, execute, and deliver to appellants a good and valid bill of sale, in due form, transferring the goods, and that these appellants, in connection with one A. S. Brice, and defendant Bettis, were to ascertain the amount due each of the various creditors by said Eagle Drug Company, and apply said cash payment to the payment and discharge of each of said creditor's claims, to the extent thereof, if necessary, or as much thereof as was necessary to pay all of said debts, and any balance of said cash, if any, left after paying said debts, was to be paid over to the appellee in satisfaction of any and all interest or claim he held in or to said property. They alleged that the inventory of said stock amounted to the sum of $5,760.10; that the amount of said cash held was $1,005.45; that the total amount of fixtures which were purchased from Houssels & Fain, as disclosed by the inventory, made by said parties, amounted to $2,187; and that the full amount of the remainder of said fixtures was $563. It is alleged that during the pendency of the negotiations that appellant entered into an agreement in writing with Bettis, stipulating that whatever equity Bettis had after the payment of the indebtedness of the Eagle Drug Company, which existed prior to March 20, 1913, and all expenses incidental to the transaction (meaning the sale of the property to appellant) had been paid; that said equity, if any, was to be deposited in the Farmers' State Bank, to the credit of appellee; and it was further provided, among other things, that the $5,000 cash payment to be paid should be applied, as far as it would go, to the then present indebtedness of the drug store; that the agreement was made the 27th day of March, 1913. It is then alleged that they applied to Bettis for a list of creditors of the company, and that they sent out notices to the creditors under the Bulk Sales Law. They alleged that they discharged the debt assumed to the Crowdus Drug Company, and the Waggoner National Bank, and ascertained the debt due on the list, which amounted to the aggregate sum of $5,284.84; that they paid, under the agreements, certain expenses incidental to the sale, to appellants, aggregating the sum of $300; that after adding up the list they believed that there was a balance remaining due on the equity of Bettis of $502.53, and, so believing, paid that amount to White, the appellee. They set up the fact that Bettis and White executed to them a bill of sale for the stock of goods on the 5th of April, and they allege the execution of the bill of sale aforesaid by White, as in effect a release of any claims or lien on the stock of goods sued upon by appellee.

By supplemental petition, the appellee denied generally the allegations in the answer,

and denied that he had any interest in the drug store, and that if there was a bill of sale, executed by Bettis to him, that he knew nothing of it, and that it had never been delivered to him, and that the bill of sale signed by him April 5, 1913, was signed, but not to be delivered until his claim and indebtedness had been fully satisfied, and that the appellants procured the same fraudulently and without his consent, and he denies that there was any agreement made by him on the 20th of March, 1913; that the appellants tried to induce him to sign such contract as a party thereto, but that he refused to do so.

All of the allegations made by the appellants in their answer are denied by the appellee, and the pleadings are so voluminous that we are unable to set them out more at length than above stated.

This case was tried before a jury upon special issues, and upon their answers returned a judgment was rendered with foreclosure as prayed for on the $1,000 note, together with interest and attorney's fees against Bettis and the appellants, and also a judgment on the account for the sum of $872.54. From this judgment the appellant herein appealed.

The evidence in this case shows that S. D. Bettis was in charge of the Eagle Drug Company in the town of Vernon, during the year 1912, up to March 20, 1913; that he drew up a contract, dated March 20, 1913, with the appellants herein, to convey to the appellants the drug store, reciting therein that the Eagle Drug Store, a partnership composed of White and Bettis, entered into the contract with the appellant. At the time he signed the contract White was away from home and did not return for some four or five days, and upon his return he was requested to sign the contract with Bettis, which he declined to do for the reason stated by him, that he was not the owner or interested in the drug store. The appellants proceeded, under the Bulk Sale Law, to call upon Mr. Bettis for a sworn statement of the creditors of the store, which he delivered to them and registered notices were sent out to the various creditors, who were scattered over the state, and the United States. While awaiting the required time under the law for answers from the creditors, an execution was issued out of the district court of Tarrant county, on a judgment in favor of J. D. Hagler, against S. D. Bettis, for the sum of $1,415.38. Before the levy was made Bettis visited White, who lived in the country some distance, and requested White to prevent the levy being made. White called up the sheriff and told him not to levy on the goods. Just what claim White made in the matter at the time he was talking to the sheriff over the phone is not clear from the testimony. However, the sheriff, after procuring an indemnity bond, proceeded to make the levy on the stock of goods, and afterwards White came in and money was procured from him to pay off the judgment and release the goods from the levy. The trade was then consummated between Bettis and appellants, and it is contended in this case by appellants that White joined with him in making the trade or sale. A bill of sale was executed for the stock of goods by White and Bettis, to appellant, April 5, 1913, which appellant had in possession, but which White contends, and the jury found, was not to be delivered until the debt and claim sued on by him were fully satisfied and discharged. Some time afterward appellant paid to White $502 and some cents, by check, which White applied on the $1,415.38. We find in the record no aggregate amount of the inventory of the goods, and there seems to be no evidence of the creditors named in the list furnished by Bettis to appellants during the negotiations. However, the testimony is that after paying all the other listed creditors, and the amounts which were assumed to be paid by appellants, that there was no equity in the goods except $502. This amount the appellants contend was more than the equity of Bettis in the stock of goods, for the reason that they made some mistake in their calculation. This is simply a general outline of the facts in the case, and the particular facts, together with the several instruments introduced in evidence, will be noticed more in detail in considering the several assignments.

[1] The first and second assignments complain of the action of the court in charging the jury that they should not consider the contract of March 20, 1913, as any evidence of joint ownership of interest in the business between White and Bettis. The ex parte declaration of Bettis, who purported to be the partner of White, in the absence of White, is not admissible for the purpose of proving the partnership or agency. The trial court, we think, correctly instructed the jury that the recitals in the contract, dated March 20, 1913, to the effect that White was a partner in the Eagle Drug Company, could not be considered as evidence to prove partnership. The evidence in the case is that Bettis drew up the contract and signed it for the company, by himself and as manager. White did not, according to his testimony, authorize him to do so, and refused to sign the contract, asserting that he was not a partner, and that the store was not his. Robinson v. National Bank, 98 Tex. 184, 82 S. W. 505. The rule is different where the evidence tends to show liability on the part of the partnership. Such declaration is admissible, if aliunde the declaration there is other testimony tending to establish partnership. The court did not withdraw the contract from the consideration of the jury on the question of liability if they otherwise found a partnership, but simply told them they should not consider the contract as evidence of the partnership.

[2] At this time we will consider the sev-

enth assignment which is to the effect that the court erred in rendering judgment for the full amount of the note sued on for the reason that the uncontroverted evidence shows that this note was one of the listed claims furnished which was to be paid, and that the $502.33 should be applied on the note, instead of on the $1,415.38 claim.

The facts in this case establish, we think, that appellants purchased the Eagle Drug Company from Bettis, and were to pay for the stock of goods at their original cost, for the fixtures at the price fixed by an inventory thereof in a list known as the Houssels & Fain inventory, and for other fixtures at their original cost. The first written contract, which purports to be made by these appellants on the one part and the Eagle Drug Company, a partnership composed of White & Bettis, on the other part, dated March 20, 1913, provided that the stock was to be invoiced "according to correct price list of wholesale dealers in drugs and druggists' sundries." This contract stipulated the sellers should, when the full amount was ascertained, execute a bill of sale, warranting against every claim or debt that could be made or charged against the stock, or against the parties purchasing. The proposed purchasers agreed to pay, when the bill of sale was executed, $5,000 cash, and the balance, if any, in monthly installments of $300. This contract further stipulated that when any of the prices affixed to articles are not in accordance with the original cost of the articles, charge should be made so as to correspond with the original cost. These articles as attached appear to refer to the invoice of certain fixtures, theretofore made by Houssels & Fain. About the 25th day of March, 1913, this contract was presented to White for his signature, which he refused to sign, because, he claimed, he was not the owner of the store or a partner therein. The evidence at this point is very conflicting. Appellants contend that when White was informed he would be liable for the debts if he signed the contract he said he would not sign; the appellants contending that unless he (White) would get behind the deal they would not make the trade and they claim they declared the trade off. But it is certain from the evidence that Bettis was called on for a list of the claims against the business, and that he furnished that list, and it is reasonably certain the note sued on was one of the debts on the list furnished. The evidence is not clear whether the list was furnished and notice registered and sent out to the creditors just before or just after White refused to sign the contract.

It is shown by the evidence that about the 26th of March, 1913, the sheriff received an execution, issued out of the district court of Tarrant county, on a judgment in favor of Hagler against S. D. Bettis, for about $1,415.38, with instructions to levy on the drug store. Bettis on notice of this fact visited White, who lived in the country, and while there White phoned the sheriff to let the store alone. The sheriff thinks that White claimed to own the goods, but was not certain as to what was said. White admits that he told the sheriff to let the goods alone, and that he had a lien on the goods. He also admits that he knew his lien would not warrant the sheriff in refusing to make the levy. The sheriff procured an indemnity bond, and the evidence indicates the levy was made on the 27th day of March, 1913. Bettis then got White to come into town, and the money was obtained from him, White, to pay off the judgment and release the store from the levy. On the 27th day of March, 1913, White and Bettis entered into an agreement. It is recited therein that an execution issued on a judgment in the district court of Tarrant county, for the sum of $1,415.38, was that day levied on the goods, and that White, for Bettis, had paid off the judgment, and that the store was transferred to De Pauw, Ross, and Garland. It was recited and agreed between White and Bettis that after the indebtedness should be ascertained and the contract entered into on the 20th day of March, between the purchasers and the Eagle Drug Company, had been complied with, then that whatever equity, if any, after all indebtedness on and prior to March 20, 1913, and all other expenses incidental to said transaction, has been paid, that the equity of Bettis, if any, was to be deposited in the bank to the credit of White until he is reimbursed for the amount paid on the judgment. Bettis also agreed to deposit the notes and accounts of the store in the bank due prior to March 20, 1913, for collection, and that upon collection the amount should be held in the name of White as trustee; and when it should be definitely ascertained how much equity Bettis had in the store funds, it should be applied as far as it would go to the amount so advanced by White; and in case there was no sufficient amount, the remainder was to be taken out of the trust fund, and the balance, if any, after said indebtedness to White shall be paid, turned over to Bettis. "It is further agreed and understood that the $5,000 cash payment to be paid the said Eagle Drug Company store shall be applied to the payment so far as it will go [to] the present indebtedness of said drug store." The contract is signed by S. D. Bettis and J. F. White.

White admits that De Pauw was present when he and Bettis made the above contract and knew about it. Mr. Cecil Storey, who drew the contract, says that De Pauw was present when the contract was drawn up between White and Bettis, and requested that the last clause above quoted, with reference to the $5,000, be added in the contract, which was done. White says at that time he did not know either Garland or Ross, and had no rec-

ollection of having seen them, and that whatever representations were made were made to him by De Pauw. The appellants all testified that they did not assume to pay the creditors of the drug store, except in such amount as the goods would amount to. It does not appear to be a controverted fact that the $1,000 debt was on the list of claims furnished appellants by Bettis. There is no evidence that the $1,415.38 was on the list of claims furnished by Bettis to appellants. On the 5th day of April, 1913, Bettis and White signed and acknowledged a bill of sale to the appellants to the store, for the recited consideration of $10,000, $8,000 cash and the assumption of $2,100 indebtedness due the Crowdus Drug Company by appellant. This bill of sale the jury found that White understood was not to be delivered until he was paid. Bettis testified by deposition that appellant agreed to assume all of the indebtedness of the Eagle Drug Company, but he also testifies that the invoice of the goods was taken and the price extended from the regular current jobbers' list, and that there was no written agreement to assume the indebtedness of the store. We are unable to determine from this record just what the total inventory of goods and fixtures were and the total value according to wholesale prices. Neither are we able to determine who of the creditors were in the list and the total amount of the listed debts. The appellants swear, and their testimony is uncontroverted, that after paying the listed debts and the Crowdus Drug Company debt, which they assumed, that there was remaining an equity going to Bettis, of $502.33, which they paid by check on the 2d day of May, 1913, which was payable to the order of White, and that they indorsed in the corner of the check, "Payment in full of account." The jury make no finding as to the value of the goods sold, or the amount of the listed debts.

We have concluded that the contract made by White and Bettis March 27, 1913, required all the debts prior to March 20, 1913, to be paid out of the sale and the consideration for the store; and if there then should be any equity, it should be applied on the $1,415.38, paid by White for Bettis. The $1,000 note, with the lien, being one of the debts so due, should first be paid before applying any part of the consideration on the $1,415.38. The trial court should have applied the $502.33, as of the date of its payment. The agreement of March 27th amounted to a direction by Bettis and assented to by White, to apply the proceeds of the sale to the other debts designated in the list, one of which was the $1,000 note, before any of the sum should be applied to the amount advanced by White to Bettis, to release the goods from the levy; and when this payment was made to him, it was his duty to so apply it as he had agreed it should be done. Merrick v. Rogers, 47 S. W. 801; Rugeley v. Smalley, 12 Tex.

238; Bank v. Gibbs, 96 S. W. 947, Willis v. McIntyre, 70 Tex. 34, 7 S. W. 594, 8 Am. St. Rep. 574; 30 Cyc. 1237 (f), 1240 (2), 1248 (7 and 8), 1250 (e).

The application should be so made, whether or not appellants assumed the note as part of the consideration for the store.

[3] The eleventh assignment complains of the action of the court in admitting the testimony of Storey as to the discussion he had with White and his opinion as to the effect of the bill of sale of April 5, 1913, and his advice to White, etc. We do not believe this testimony is admissible. If it was agreed between the parties that the bill of sale should not be delivered until the payment of the indebtedness, such fact was admissible, but in the absence of the appellants or either of them, statements made and matters discussed between the attorney and his client should not be admitted. The appellee herein contends the record shows that appellants were present on that occasion. We do not so read the record. There is a general statement made by the witness that the parties, as he understood, agreed, etc. He does not state who these parties were and when and where it was that he so understood. This evidence, as to the presence of the parties by the witness, was entirely too indefinite to admit the discussion between himself and White. Chilson v. Oheim, 171 S. W. 1074. The appellee cites the cases of Security Trust Company v. Stuart, 163 S. W. 396; Britt v. Burghart, 16 Tex. Civ. App. 78, 41 S. W. 390. The testimony complained of in this case does not fall under the rule announced in the cases cited by appellee and recognized by this court in the case of Memphis Cotton Oil Company v. Goode, 171 S. W. 284.

The twelfth and thirteenth assignments relate to testimony of De Pauw, offered and excluded. This testimony was admissible under the circumstances in connection with it. The trial court, however, appends a statement to the bill of exceptions showing this testimony was in fact admitted after appellants offered to show and did show White was present. For this reason the assignment is overruled.

[4, 5] Appellants present several assignments, to the effect that the answers of the jury on issues 3 and 4 are uncertain, and fail to answer the material issue in the case; that the answers of the jury did not warrant the judgment of the court on the $1,415.38 advance sued for, less the credit applied by White, and that the evidence did not support the answers of the jury. The third issue is as follows:

"If you answer the last question in the affirmative, then say whether White was induced to pay said sum by said Du Pauw, if you find he was, by the promise, if you find there was, that said sum in its entirety would be repaid to him by Garland, Ross, and De Pauw; or did De Pauw represent that they would pay White what was left over after other creditors should be satisfied? State fully whether De Pauw made

either of such representations, if so, which? Answer: De Pauw induced White to pay, believing there was sufficient equity out of equity."

Fourth issue:

"If in answer to the last question you say that De Pauw represented that White would be paid out of such money as might be due to Bettis after the other creditors should be paid, then state whether White was induced to part from his money on that occasion, if you find he was, by such representations, if you find there was. Answer: He was."

The jury, by issue 3, was required to answer two questions: (1) Was White induced to pay the sum by De Pauw by a promise that the entire sum would be repaid to him by appellants? Or (2) did De Pauw represent that they would pay what was left over and after other creditors should be satisfied? The jury's answer to these two questions answered neither. The first question required an answer whether White was induced to pay upon an unconditional promise to pay the entire debt. The jury does not answer this question, but they answer White was induced by De Pauw to pay, believing there was sufficient equity. They do not answer that appellants promised to pay that sum in its entirety. The answer of the jury would simply indicate that White was induced to pay by representations that there was sufficient equity to pay, and not that he was induced to pay because of a promise to repay by appellants. The answer of the jury would give, if anything, White a recovery upon deceit. The question propounded called for an answer as to whether there was a contract by appellants to pay—two very dissimilar causes of action. The answer to the fourth issue would indicate that they found White was induced to part from his money by the representation that he would be paid out of such money as might be due Bettis after other creditors should be paid. If this is their finding, then clearly, if there was no money left after paying other creditors, the court could render no judgment in favor of White, for the money so advanced. All that was left was $502.33, according to this record, and according to the written agreement between White and Bettis it was agreed this should be applied to the debts owing by the business March 20th, and the equity left, after the application so made, should be paid on the sum advanced, as pointed out by us in considering assignment No. 7.

The first question in issue 3 was not raised by the pleadings. Appellee simply alleged that appellants were to pay this advancement out of the "equity" of Bettis. Now, this equity could only be ascertained by paying off the indebtedness against the store. When that was done, the equity remaining, if any, it was alleged should be paid on this sum. There was no recovery sought by the petition for this item upon an unconditional promise to pay; but it is alleged that the equity of Bettis was to be paid to White, and

out of the price appellants were paying for the goods. White also sought a recovery upon misrepresentations by De Pauw as to the value of the stock and the debts against it, and the amount which would be left, going to Bettis. This issue was not submitted to the jury by either of the above questions. These representations, if made, were clearly expressions of opinion. The contract by White and Bettis, on the 27th of March, shows the amount was not then ascertained. Storey's testimony indicates the parties did not then know what would be coming to Bettis after the debts were paid. In one portion of his testimony White said, at the time he signed the contract of March 27th:

"It was understood and I knew that there might not be enough money coming out of the purchase price of this drug store to pay my debt."

We think all these facts indicate that if De Pauw made this representation it was only an opinion, and was not a representation of a fact, and did not purport to be. We therefore think the trial court, under this state of facts, should not have rendered judgment upon a finding by him that De Pauw falsely represented the facts, and thereby induced White to pay out his money. We are satisfied the trial court did not render the judgment upon such a finding, but that he regarded the findings of the jury as sufficient to authorize the judgment. We think the court was in error in rendering judgment on these findings.

The twentieth, twenty-first, and twenty-third assignments complain of the action of the court in submitting supplemental issues Nos. 1 and 2, and the answers of the jury thereto, for the reason that the evidence did not warrant the submission or the answers thereto. The issues are:

"(1) Did J. F. White, the plaintiff herein, accept the check for $502.33, as a payment on the $1,000 note? Answer: No.

"(2) Did J. F. White accept the check for $502.33, as a payment on the $1,415.38 matter? Answer: Yes."

What we have said in disposing of the seventh assignment will dispose of the above. Appellee, in answer to these assignments, says the contract of March 27th shows that Bettis' equity should be applied on the $1,415.38. The contract clearly provides that this balance or equity is not to be so applied until all of the debts owing by the Eagle Drug Company prior to March 20th are paid. Bettis was the debtor in this case, and had the right to direct the application of payments, which he did, by his written contract with White, and White thereby assented to it. Appellants knew of this direction and acted upon it. Bettis had given them a list of the debts to be paid; the $1,000 due White was one of them; the $1,415.38 was not on the list, and no claim is made that it was. When White accepted the check he did so under his agreement that the list debts should first be paid, and he could not, upon his own

motion, in the face of his written agreement, place it elsewhere.

[6] The twenty-third and twenty-fourth assignments relate to the delivery of a bill of sale, dated April 5, 1913. Objection is made to the finding of the jury to the sixth issue, which finding is in effect that the bill of sale, which was delivered to Sam Hogsett, was to be delivered only after White should have been paid. This objection by appellant we regard as technical and rather hypercritical. The real issue was whether appellants agreed with White that the bill of sale should not be delivered or have effect until he was paid. The issue submitted this question we think substantially. While the evidence is weak, that any such instruction was given to Hogsett by any one, yet if it was agreed that it should not be delivered, the issue submitted would not likely be misunderstood by the jury. This conclusion disposes of the twenty-fourth assignment, to the effect that the bill of sale was a release of the mortgage lien.

[7, 8] The twenty-fifth and twenty-sixth assignments assert the jury were not warranted in finding that appellants assumed the payment of the $1,000 note. The jury found that appellants assumed the payment of the note. There is some evidence to support the finding. Bettis says the appellants agreed to assume all of the indebtedness of the drug store. It is true that his bill of sale recites the assumption only of the Crowdus Drug Company debt. The appellee, in reply, in support of this verdict, refers to testimony to the effect that this claim was listed as one of the debts of the drug store, and we presume that they contend that because listed, it was thereby assumed. It appears to be the construction by the courts of article 3972, Revised Civil Statutes, that if a party purchase in bulk goods the Bulk Sales Law will not impose a personal liability on the purchaser, by virtue of the law itself. Bewley v. Sims, 145 S. W. 1076; Owosso, etc., v. McIntosh, 179 S. W. 257. It does not occur to us that it was the purpose of the law to penalize a purchaser, who in good faith procures a list of the debts of the seller and gives the required notice, by making him personally liable for all the debts, whether the goods in value are sufficient to pay them or not. In this case the seller and purchaser agreed to the method of finding the value of the goods; that is, they were to pay the cost price as shown by wholesale dealers' price list. This would give the consideration for the goods. We do not see very well how it can be insisted that appellants should pay more than the contract price, and thereby make them personally liable for the debts, over and above that amount. Of course if the agreement was that as a consideration for the goods the appellants assumed the indebtedness and agreed to pay them, they would be personally liable on their assumption. According to this record, if appellants agreed to pay all the debts, and as claimed by Bettis,

pay in addition the $1,415.38 due by him to White, the appellants were wanting a second-hand stock of goods very much. If the testimony is true that there was only an equity of $502.33 after paying the listed debts, except the $1,000 note sued on, they agreed to pay something over $2,000 more than Bettis priced the goods and agreed to take. Whether they assumed this debt or not, and became thereby personally liable thereon, if White did not waive his mortgage lien, he was entitled to a foreclosure of the same for the amount of the debt, after allowing proper credits and making proper application of payments. This would be allowed him upon establishing his debts against Bettis.

The twenty-seventh assignment will be sustained for reasons given by us in considering the seventh.

[9] The jury found that, when the levy of the execution was made, appellants were partners. They further answered an issue that appellants entered into an agreement to buy the store as partners and run it as such. Appellants had not bought the store when the levy was made. The bill of sale to them was not made until April 5, 1913, and the cash consideration was not paid until some time about the 9th of April. In the petition White does not allege that appellants had purchased the store when the levy was made, but it is alleged they in a manner had taken charge, with a view of getting familiar with the business in order to finally close the deal.

The case appears to have been tried in the court below upon the theory that from the time appellants agreed to purchase the drug business they were partners. The facts in this case appear to be uncontroverted that appellants agreed to purchase the business and pay the original cost price for the goods, and to apply the price paid on the debts of the drug company. Garland was to have and pay in one-half, and the other two one-fourth each. We think until the purchase was made and the business delivered to appellants, they could not be said to be partners. Until this was done the agreement between appellants was an executory contract to form a partnership, and was not a partnership, though it thereafter ripened into a partnership by being launched. The agreement was to enter into a mercantile business; that is, buying and selling goods. Until the business was acquired, the partnership was inchoate or tentative. Until the partnership was launched, one party to the agreement was not authorized to bind the other upon the contracts entered into by him before the consummation of the partnership. Bates on Partnership, § 78; 30 Cyc. 358 (g), 522, 523 (14 and 15); Buzard v. McAnulty, 77 Tex. 438, 14 S. W. 138.; Rogers v. Nichols, 20 Tex. 724.

We make the above suggestion for the guidance of the parties in considering the testimony as to representations made by De Pauw. If it was not then a partnership, or if he was not authorized as an agent to make

such representations, and they were not within the scope of his authority, such representations would not bind Ross and Garland, unless they thereafter knowingly ratified the acts of De Pauw.

The judgment as to appellants Garland, De Pauw, and Ross will be reversed and remanded; as to Bettis, who is not complaining in this court, the judgment will be affirmed. The judgment will not be disturbed as to Bettis. Reversed and remanded.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes