## FIRST NAT. BANK OF TULSA v. HOOVER et al. (No. 2030.)

(Court of Civil Appeals of Texas. Amarillo. Nov. 15, 1922.)

**1. Chattel mortgages ☞229(1)—Evidence as to waiver of mortgage lien held sufficient to go to the jury.**

In an action on a note by the holder in due course for the balance due and a foreclosure of the mortgage, after the mortgaged property had been sold by the mortgagor, evidence as to waiver of the mortgage lien *held* sufficient to go to the jury.

**2. Chattel mortgages ☞219—Mortgagee's consent to sell on conditions not a waiver of lien, unless the conditions are performed.**

Where a mortgagee's consent to a sale by the mortgagor is given upon condition, the condition must be performed in order to render the consent a waiver of the mortgage lien as against a purchaser who had knowledge thereof.

Appeal from District Court, Hemphill County; W. R. Ewing, Judge.

Action by the First National Bank of Tulsa against H. E. Hoover and T. V. Ellzey. Judgment against defendant Ellzey and in favor of defendant Hoover, and plaintiff appeals. Reversed and remanded.

Sanders & Jennings, of Canadian, for appellant.

Frank Willis, of Canadian, and A. A. Lumpkin, of Amarillo, for appellees.

HALL, J. The appellant bank filed this suit in the district court of Hemphill county, against T. V. Ellzey and H. E. Hoover, alleging that on or about the 15th day of April, 1920, Ellzey executed two notes for $5,000 each, due August 1, 1920, three notes for $5,000, due October 1, 1920, one note for $3,300, due October 1, 1920, and one note for $2,500, due October 1, 1920, all payable to the Union National Bank of Tulsa. Okl. That at the same time he executed a chattel mortgage for the purpose of securing said notes, conveying 380 white-face cows, 150 white-face calves, and three bulls, which said mortgage contained the following clauses and stipulations:

"With interest thereon at the rate of ten per cent. per annum from maturity according to the terms of renewal or extension of said notes, which may be made by consent of said second party, and may be evidenced by the execution of new note or notes in place of said original note, at or after maturity for the amount of the debt then unpaid, and payable hereunder, and for which this mortgage is and shall be a continuing security until paid, whether said debt be evidenced by said original notes above described or any renewals or extensions thereof."

"It is further understood and agreed that this mortgage and all rights, privileges and powers therein vested in the party of the second part shall inure to and be exercised by any subsequent owner or holder of the notes secured hereby and that the same shall be binding upon the personal representatives, successors or assigns of the parties hereto."

It is further alleged that the mortgage was filed in the office of the county clerk of Hemphill county, April 19, 1920, was duly registered, and is still of record and in force; that in accordance with the terms of said mortgage, on the 22d day of November, 1920, defendant Ellzey executed a new note for the sum of $942.48, due January 1, 1921, which new note was a renewal and extension of the remainder of the indebtedness evidenced by the series of original notes theretofore executed; that prior to the date of the execution of said renewal note all of the cattle covered by the mortgage and securing said indebtedness, except 50 head of white-face calves, had been sold and applied on the indebtedness, and the said 50 head of calves were all the security left to secure said renewal note; that the defendant H. E. Hoover purchased from the defendant Ellzey said remaining head of calves and as part of the consideration assumed the payment of the remainder of said indebtedness; that the said Hoover is in possession of the cattle, claiming title to the same and holding the same on his ranch in Hemphill county; that plaintiff, the First National Bank of Tulsa, Okl., had by a transfer in due course become the legal and equitable owner and holder of said renewal note and indebtedness; that the defendants became bound and liable to pay plaintiff said sum of money evidenced by said promissory note, together with interest and attorney's fees, but though often demanded and requested defendants have failed and refused, etc. The prayer is that plaintiff have judgment for its debt, interest, attorney's fees and costs of suit, for foreclosure of the chattel mortgage, for the sale of the 50 calves, and for all such other and further remedies and relief, general and special, in law and in equity, to which it may show itself justly entitled, etc.

Ellzey filed no answer and there was judgment against him by default. Hoover answered by general demurrer, special exceptions, general denial, and specially denied that he assumed the remainder of the indebtedness described in plaintiff's petition, or that he ever in any way agreed or became bound to pay the same or any part thereof, or the note or any part of the note mentioned by plaintiff. He alleged further that long prior to the date of the execution and delivery of said note and mortgage on November 22, 1920, he had purchased from Ellzey, with the knowledge and consent of the mortgagee, the Union National Bank of Tulsa, Okl., the 50 head of calves; had taken possession of the same, placed his brands up-

on them, and paid for them by check at the price of $36 per head, less pasture charges against them, which charges were deducted from the purchase price under the directions and with the knowledge and consent of the mortgagee, the Union National Bank of Tulsa, Okl.; that if the defendant Ellzey ever gave, or attempted to give, to said Union National Bank a mortgage upon said calves, it was given and received in fraud, and at such time Ellzey and said bank well knew that the calves had been sold and delivered to him by the said Ellzey, with the knowledge and consent of said bank, and that same was done without his knowledge or consent, and that said mortgage as against him is void, and, being void between the original parties, is likewise void in the hands of the pretended purchaser of said note, the plaintiff herein. This part of the answer is verified. The plaintiff bank replied by a general demurrer and general denial.

There was a trial before a jury. When plaintiff closed in the introduction of testimony, the court directed a verdict against Ellzey for the full amount, and further instructed the jury to return a verdict for defendant Hoover and against the plaintiff, denying a foreclosure of the chattel mortgage. The appellant insists that this was error, because: (1) It had made out a prima facie case entitling it to a foreclosure of the mortgage lien; (2) that the evidence was such that reasonable minds might reach a different conclusion; (3) that since it appeared that Hoover had purchased and converted the mortgage property with notice, the court should not have directed a verdict against a foreclosure; and (4) that where the proof on the issue of plaintiff's right to a personal judgment against one who had purchased and converted the mortgaged property is such that reasonable minds might reach different conclusions, it was error for the court to direct a verdict against it on such issue. The bank introduced the note in evidence; also the original notes, payable to the Union National Bank or order, and the chattel mortgage described above.

Ellzey testified, admitting the execution of the original notes and mortgage, that the renewal note, for $942.48, was given for the balance due on the original notes described in the mortgage; that out of the 150 head of white-face calves he had sold 50 of them to the defendant Hoover at $35 per head; that the sale was made in June, 1920, but the calves were not delivered until October, 1920; that Hoover paid to the Union National Bank all of the purchase price except $942.48, and promised to pay said sum a little later on; that Hoover requested the bank to wait on him for the balance; that the renewal note was made because Hoover requested that a little more time be granted for him to discuss a pasture bill proposition with one Moody; that Hoover was holding

up the balance to get a settlement out of Moody, since it seemed that there was a controversy over some business affairs between Hoover, Ellzey, and Moody, which Hoover desired to get straightened out before settling for the cattle; that he told Hoover there was a mortgage on the cattle, and to send the money to the mortgagee; that he (Ellzey) could not use it, and that Hoover promised to pay the money to the mortgagee bank; that the mortgagee bank had instructed Hoover before any payment was made not to pay Ellzey but to make payment to the bank. Upon the issue made by Hoover's pleading that the calves had been sold with the knowledge and consent of the mortgagee bank, Ellzey testified in part as follows:

"Q. Isn't it a fact that you had authority from the mortgagee, the Union National Bank of Tulsa, to sell these cattle and report to them the proceeds? A. I had a right to sell by their O. K. when they O. K.'d the transaction. I notified them I had sold these cattle to Hoover subject to their O. K., because they had a mortgage on the cattle. The bank agreed to the sale if they got the money, but they haven't got the money. It was agreeable to them when they got the money; the cattle I was selling were mortgaged. I had the bank's consent to deliver the cattle and collect the money for them, but the money hasn't been collected.

"Q. It was all right for you to sell them, provided you turned them the money? A. Absolutely. The contract—if they got the proceeds. * * * The bank didn't give me any authority to turn over anything under sale until I reported and gave the bank the money. Immediately after I made the deal to sell the cattle to Mr. Hoover I wrote the bank, and asked if it was agreeable to them that Mr. Hoover had agreed to pay on delivery of the calves at his pasture. I absolutely had the consent of the bank to turn over the cattle, provided I turned over the money to the bank. * * * They hadn't given me the authority to sell anything, except that I turn over the proceeds to them. We delivered the calves the 1st of October, and I wrote the bank the calves had been delivered, and that Mr. Hoover would pay the difference between the pasture bill and the purchase price of the calves. He sent the difference between the amount this note was given for and the pasture bills that we owed him for the pasturing of the cattle; but the bank refused to accept the check, and wrote to him for the full amount, and later on they sent a representative here; and we went up to Mr. Hoover's office, and he told Hoover the bank was going to sue for the cattle; that they had never received payment for them, and Mr. Hoover said to let the thing rock along for a little while; that there were certain things among them—an amount of money that Mr. Moody owed him—and that when that was straightened up in a short while it would be paid.

"I never received a dollar in payment of these calves myself. Mr. Hoover was notified by me and by the bank to send the money to the bank. I told Mr. Hoover that the bank had a mort-

gage on these cattle, and that I could not use the money for any purpose at all, and to send the money, all that was due for the balance of the calves, outside of the pasture bill, to the bank. I wrote the bank, and told them that we had made this deal; that the pasture bill was to come out, and that Hoover was to pay the balance, and that I would have him send the money to them. He would send check for the difference between the pasture bill and this amount, but would not send this amount.

"The bank never did tell me it was all right to go ahead and deliver the calves to Mr. Hoover without payment. I told the bank about it before delivering the cattle, and they wrote Hoover before the cattle were delivered that when the cattle were delivered he was to send them the money. When the bank's representatives and I went to Hoover's office he says: 'Moody owes me money, and I want to get it out of him. I think things will be straightened up in a little while if you don't push it.' The bank never did give me any authority to sell any of the cattle or deliver any cattle that they had a mortgage on, except where I made this deal, and where I had shipped them would send a man out and tell me to ship some cattle, and the commission people would be notified to send this money to them, just as Mr. Hoover was notified to send the money to them in this transaction in question."

[1, 2] We doubt the sufficiency of appellee's answer to raise the issue of waiver of the mortgage lien as to him by the bank's consenting to the sale of the cattle, but, admitting that the pleading is sufficient under this evidence, we think it is clear that the issue should at least have been submitted to the jury. Ellzey's testimony tends strongly to show that the bank's consent for him to sell and deliver the cattle was upon the condition that the bank should first receive the money, or that the purchaser should remit the purchase money directly to the bank. There is no evidence contradicting this, and Ellzey testified that Hoover did send the bank part of the money due for the cattle, which the jury might construe to be an admission upon his part that he knew of the condition, and recognized the right of the bank to receive the money in fulfillment of it. The rule is that when a mortgagee's consent to a sale by the mortgagor is given upon condition, the condition must be performed in order to render the consent a waiver of the mortgage lien as against a purchaser who had knowledge thereof. Eagle Drug Co. v. White (Tex. Civ. App.) 182 S. W. 378. Martin Co. v. Nicholson (Tex. Civ. App.) 149 S. W. 280, is authority for the rule that the question of waiver of the lien and estoppel against the mortgagee to assert it are issues which should be submitted to the jury.

Hoover was bound by the recitals in the mortgage which authorized Ellzey and the bank to extend the original notes or to execute and take renewal notes of balances due from time to time. Warren v. Osborne (Tex. Civ. App.) 97 S. W. 851. According to the testimony of Ellzey, Hoover agreed as part of the consideration for the calves to pay the debt. Being bound by the recitals in the mortgage he is personally liable for the full amount due, whether the indebtedness is evidenced by the old notes or a renewal thereof. Trabue v. Wade (Tex. Civ. App.) 95 S. W. 616.

Since the case has not been fully developed, the judgment will be remanded for further trial. Because of the action of the court in directing a verdict with reference to Hoover's liability and the foreclosure of the mortgage upon the 50 calves, the judgment is reversed and remanded.